UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELINDA ELLEN MORRIS,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN,<br><br>　　　　　　Defendant. | Case No. 16-cv-00674-JSC<br><br>**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 13, 15 |

United States District Court
Northern District of California

　　　Plaintiff Melinda Ellen Morris ("Plaintiff") brings this action pursuant to 42 U.S.C. Section 405(g), seeking judicial review of a final decision by Defendant Carolyn W. Colvin, the Commissioner of the Social Security Administration ("Defendant" or "Commissioner"), denying her application for disability and insurance benefits under Titles II and XVIII, Part A, of the Social Security Act.  42 U.S.C. §§ 401-403, 1395.  Both parties have consented to the jurisdiction of the undersigned magistrate judge.  (Dkt. Nos. 7, 8.)  Now pending before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment.  (Dkt. Nos. 13, 15.)  After carefully considering the parties' submissions, the Court GRANTS IN PART Plaintiff's motion and DENIES Defendant's cross motion.

**LEGAL STANDARD**

　　　A claimant is considered "disabled" under the Social Security Act if she meets two requirements.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be

1   severe enough such that she is unable to do her previous work and cannot, based on her age,

2   education, and work experience, "engage in any other kind of substantial gainful work which

3   exists in the national economy." *Id.* § 423(d)(2)(A). To determine whether a claimant is disabled,

4   an ALJ is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL BACKGROUND

On October 29, 2006, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act. (Administrative Record ("AR") 121-125.) Plaintiff alleged disability beginning April 28, 2006. (AR 121.) Her claim was initially denied by the Social Security Administration ("SSA") on April 5, 2007, then was denied again on reconsideration on September 7, 2007. (AR 79-83, 85-89.) Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ"). (AR 91.)

On January 23, 2009, ALJ Thomas P. Tielens held a hearing in San Rafael, California, during which both Plaintiff and vocational expert ("VE") Linda Berkley testified. (AR 40-41.) On July 24, 2009, the ALJ issued a written decision denying Plaintiff's application and finding that Plaintiff was not disabled under Sections 216(i) and 223(d) of the Social Security Act. (AR 26-39.) Plaintiff filed a request for review (AR 117-118), which the Appeals Council denied on April 4, 2011. (AR 13-18.) On February 10, 2016, Plaintiff initiated this action, seeking judicial review of the SSA's disability determination under 42 U.S.C. Section 405(g).[1] (Dkt. No. 1.) On

---

[1] Although there was a significant delay between the Appeals Council's decision and Plaintiff's filing suit, Plaintiff's appeal is timely. On June 8 and June 26, 2011, shortly after the Appeal Council's decision, Plaintiff filed requests for extension of time to file a civil action in federal court. (AR 3.) Plaintiff did not receive a response from the Appeals Council for years, and on December 15, 2015 she filed another extension request. (*See id.*) The Appeals Council granted an extension of time on January 14, 2016. (AR 1-2.)

United States District Court
Northern District of California

July 1, 2016, Plaintiff filed the present motion for summary judgment or remand.  (Dkt. No. 13.)

Defendant filed a cross motion for summary judgment on August 1, 2016.  (Dkt. No. 15.)

ADMINISTRATIVE RECORD

Plaintiff was born on July 26, 1955.  (*See* AR 225.)  She completed one year of college and attended vocational nursing school in 1985.  (AR 152.)  From 1987 to 1990, Plaintiff worked as a part-time float nurse at a medical clinic.  (AR 139, 148, 719.)  Plaintiff took phone messages, ordered stock equipment, sent out lab information, and sterilized equipment.  (AR 719.)  From 1990 to April 28, 2006, Plaintiff worked as a pediatric home care nurse.  (AR 139, 148, 719.)  As a pediatric home care nurse, Plaintiff ordered medicine, administered home therapy, communicated with doctors, and chartered patient events and findings.  (AR 719).  For both of these jobs, she worked eight hours a day, five days a week.  (AR 148.)  On April 28, 2006, Plaintiff left her job after 16 years due to her "disabling condition."  (AR 121.)  She is married and has one child.  (AR 147, 424.)

In her disability report, Plaintiff identified fibromyalgia, back problems, and depression as the illnesses, injuries, or conditions that limit her ability to work.  (AR 148.)  Her conditions limit her ability to lift, stand, carry things, and walk without pain.  (*Id.*)  She has very little energy.  (*Id.*)  She sleeps for 12 hours a day and requires medication in order to take care of her personal needs.  (AR 131, 133.)  She takes Prozac, Robaxin, Trazadone, Tylenol with codeine, Ultram, and Valium.  (AR 151.)  She is forgetful, easily confused, overwhelmed, and distracted when handling money.  (AR 135.)

## I.      Medical Evidence

Plaintiff has had depression since October 12, 2001, and fibromyalgia for 25 to 30 years.  (AR 203, 410.)  The earliest medical records in the Administrative Record ("AR") date back to 2004, when Plaintiff visited Kaiser Permanente Santa Rosa for knee, elbow, and neck pains.  (AR 212-217.)  As set forth below, over the next two years Plaintiff was seen by numerous physicians in connection with her medical ailments.

United States District Court
Northern District of California

A.      Medical History

1.      *Initial Diagnoses: 2006*

In 2006, Plaintiff saw Dr. Richard Zweig, a rheumatologist after her primary care physician referred her to him.  (AR 218, 225.)  At the initial examination, Plaintiff told Dr. Zweig she experienced pain from her fibromyalgia, as well as pain in her proximal interphalangeal joints,[2] hips, and knees.  (AR 225.)  Plaintiff discussed her work as a private duty nurse, and complained of the difficulty performing transfers for her patient because of muscle pains in her wrists and knees.  (*Id.*)  Dr. Zweig concluded that Plaintiff had multiple trigger points in her neck and shoulders and confirmed her fibromyalgia diagnosis.  (*Id.*)  However, Dr. Zweig found no evidence of synovitis,[3] subluxation,[4] or deformity.  (*Id.*)  On a follow-up visit, Dr. Zweig determined that Plaintiff's medication was the most likely cause behind her reported forgetfulness and fatigue.  (AR 219.)  Plaintiff reported that trigger point injections were helpful for her pain and requested dry needling.  (AR 218.)

Between these visits with Dr. Zweig, Plaintiff had an accident at work while lifting a patient.  (AR 223.)  As a result, Plaintiff noticed an immediate onset of lower back pain and saw Dr. Donald Green for an evaluation.  (AR 223-224.)  Dr. Green diagnosed Plaintiff with lumbar strain[5] and referred her to physical therapy treatment.  (*Id.*)  On her following visits with Dr. Green and the physical therapist, Plaintiff expressed slow improvement with her back pain.  (AR 219.)

---

[2] Proximal interphalangeal joints are the middle joints of the fingers.  *Finger PIP Joint Arthritis / Inflammation*, Hand to Elbow Specialist Care, http://handtoelbow.com/pip-joint-arthritis/ (last visited Dec. 20, 2016).

[3] Synovitis is "the inflammation of a synovial (joint-lining) membrane, usually painful, particularly on motion, and characterized by swelling, due to effusion (fluid collection) in a synovial sac."  *Synovitis*, HealthCentral, http://www.healthcentral.com/encyclopedia/hc/synovitis-3168399/ (last visited Dec. 20, 2016).

[4] Subluxation is "a partial abnormal separation of the articular surfaces of a joint."  *Subluxation and Chiropractic*, Spine-health, http://www.spine-health.com/treatment/chiropractic/subluxation-and-chiropractic (last visited Dec. 20, 2016).

[5] Lumbar strain is "[a] stretching injury to the ligaments, tendons, and/or muscles of the low back."  *Definition of lumbar strain*, MedicineNet, http://www.medicinenet.com/script/main/art.asp?articlekey=26090 (last visited Dec. 20, 2016).

Plaintiff reported that "as long as [she does her] exercises, the back does better." (AR 219-220.)
At her final visit in November 2006, Dr. Green found that Plaintiff's lumbar strain was resolved
without any need for future medical treatment and no permanent disability. (AR 218.) He
concluded that her continual chronic pain was due to her fibromyalgia. (*Id.*) Throughout this
time, Plaintiff continued her prescriptions for Robaxin,[6] Ultram,[7] and Motrin to manage her pain.
(AR 224.)

Also in November 2006, Plaintiff began to see Dr. John Mackey, a psychiatrist who
diagnosed her with depression and anxiety. (AR 239.) He prescribed Plaintiff Prozac[8] and
reduced her Trazadone[9] medication as needed. (*Id.*) He did not think Plaintiff could benefit from
psychotherapy, so instead recommended that Plaintiff attend an "Overcoming Depression" series
at the hospital. (*Id.*) One month later, Plaintiff expressed that her depression and pain had
improved. (AR 241.) She reported being more capable of tolerating stress, her mood had
improved, and she found the Prozac "modestly helpful, but she wondered about more." (*Id.*)

### 2.   *Car Accident & Pain Management: 2007-2008*

In September 2007, Plaintiff was in a car accident and visited the Santa Rosa Chiropractic
Neurology Center. (AR 333-334, 337.) As a result of the accident, Plaintiff experienced shoulder
and neck pain stiffness, as well as confusion and fearful thinking. (AR 345.) Plaintiff reported
that prior to the car accident, she could tolerate mild yoga and 30 minutes of walking for six days a
week. (*Id.*) After four to six weeks of care following the car accident, Plaintiff could walk for 20
minutes with one to three days off in between with a three to five out of ten pain level. (AR 365.)

In the meantime, Plaintiff began attending Kaiser Permanente's Level 3 Intensive Pain

---

[6] Robaxin (methocarbamol) is "a muscle relaxant [that] works by blocking nerve impulses (or pain sensations) that are sent to your brain" that is used "to treat skeletal muscle conditions such as pain or injury." *Robaxin*, Drugs.com, https://www.drugs.com/robaxin.html (last visited Dec. 20, 2016).

[7] Ultram is "a narcotic-like pain reliever . . . used to treat moderate to severe pain." *Ultram*, Drugs.com, https://www.drugs.com/ultram.html (last visited Dec. 20, 2016).

[8] Prozac is a selective serotonin reuptake inhibitors (SSRI) antidepressant. *Prozac*, Drugs.com, https://www.drugs.com/prozac.html (last visited Dec. 20, 2016).

[9] Trazadone is an antidepressant medicine used to treat "major depressive disorder." *Trazadone*, Drugs.com, https://www.drugs.com/trazodone.html (last visited Dec. 20, 2016).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Management Program, a program for people with chronic pain, which met four hours per day for

2    five weeks and group therapy on Friday afternoons.  (AR 500.)  The program prohibited all of its

3    participants from working at any job for the duration of the program.  (*Id.*)  In the program

4    Plaintiff learned to manage her chronic pain with mindfulness and relaxation practices.  (AR 465,

5    481.)  Observation reports indicate that Plaintiff was an "active participant" with a "good

6    understanding of concepts presented in class."  (AR 490.)  Meanwhile, Plaintiff continued with

7    physical therapy and, as of November 2007, reported feeling "amazed" at how helpful the home

8    exercise plan movements were.  (AR 408.)  The home exercise plan from physical therapy

9    resembled movements she learned at the chronic pain seminar.  (*Id.*)

10         In February 2008, Plaintiff visited Dr. Christina Fritsch, who diagnosed Plaintiff with

11   chronic pain syndrome, myofascial pain syndrome, and fibromyalgia, and noted that she exhibited

12   symptoms of depression, anxiety, and sleep disorder.  (AR 492.)  Plaintiff, who was still

13   participating in Kaiser's pain management program, told the doctor that she found the program

14   helpful and that her exercise tolerance had improved.  (*Id.*)  She also reported sleeping well with

15   her new medication.  (*Id.*)  Dr. Fritsch recommended Plaintiff continue the chronic pain

16   management program as well as her Flexeril[10] and Tramadol[11] medications.  (*Id.*)

17         Plaintiff completed the program on February 8, 2008.  She then began her "step down"

18   from the program and resumed her routine medical care.  (AR 497.)  In her "step down" group

19   appointments, Plaintiff learned how to integrate pain management skills into her daily life.  (AR

20   545.)  She remained an active participant throughout the group until it ended in April 2008.  (AR

21   551, 556, 559, 598.)

22         B.    Medical Evaluations

23         In addition to routine medical visits, Plaintiff underwent several examinations to determine

24   her functional capacity in support of her application for disability benefits.

25   _____

26   [10] Flexeril is a muscle relaxant used together with rest and physical therapy to treat skeletal muscle
     conditions such as pain or injury.  *Flexeril*, Drugs.com, https://www.drugs.com/flexeril.html (last
27   visited Dec. 20, 2016).

28   [11] Tramadol is a "narcotic-like pain reliever" used to treat moderate to severe pain.  *Tramadol*,
     Drugs.com, https://www.drugs.com/tramadol.html (last visited Dec. 20, 2016).

1          1.      *Non-Examining Medical Consultant Dr. Desouza*

2          At the start of 2007, Dr. L.R. Desouza completed a physical residual functional capacity

3   assessment of Plaintiff based on Dr. Desouza's review of Plaintiff's medical record.  (AR 243-

4   247.)  Dr. Desouza noted that there was no statement from a treating or examining source for him

5   to review and that Plaintiff had a history of back sprain and confirmed her diagnosis of

6   fibromyalgia.  (AR 244, 247.)  Dr. Desouza concluded that Plaintiff should not occasionally lift or

7   carry more than 20 pounds, frequently lift or carry more than ten pounds, and stand, walk, or sit

8   for more than six hours in an eight-hour workday.  (*Id.*)  Dr. Desouza also determined that

9   Plaintiff was limited to occasionally climbing, stooping, kneeling, crawling, and crouching, but

10  Plaintiff should never balance herself.  (AR 245.)  According to Dr. Desouza, Plaintiff did not

11  require any manipulative, visual, communicative, or environmental limitations.  (AR 245-246.)

12  Dr. Desouza found that Plaintiff's symptoms were attributable to her medically determinable

13  impairment of fibromyalgia.  (AR 246-247.)

14          2.      *Examining Psychiatrist Dr. Holloway*

15          In March 2007, Dr. Renee Holloway of Disability Determination Services met with

16  Plaintiff to conduct a psychiatric review and complete a mental residual functional capacity

17  assessment.[12]  (AR 267, 281.)  Dr. Holloway found that Plaintiff had depression and anxiety.  (AR

18  270, 272.)  She also concluded that Plaintiff's daily living activities and social functioning were

19  only mildly limited, but that her concentration, persistence, and pace were moderately limited.

20  (AR 277.)

21          In the mental residual functional capacity assessment, Dr. Holloway determined that

22  Plaintiff was "able to accept instruction and criticism from her supervisors, but she would perform

23  best if it is direct, non-intensive, and non-confrontational."  (AR 283.)  Dr. Holloway also

24  concluded that Plaintiff could work well with the public and her co-workers, and that Plaintiff

25  could maintain concentration and attention for two hours and would best adapt to change in a

26

27  ───────────────────────

28  [12] Dr. Holloway first attempted to evaluate Plaintiff in August, but Plaintiff did not attend her
    assessment.  Dr. Holloway thus found insufficient evidence to make a recommendation about
    Plaintiff's residual functional capacity at that time.  (AR 298-300.)

1   stable environment.  (*Id.*)  Dr. Holloway determined that Plaintiff would have mild difficulty with

2   learning, understanding, and remembering non-complex detailed tasks, and that Plaintiff was not

3   markedly limited in any category.  (AR 281-283.)

             3.      *Treating Psychiatrist Dr. Mackey*

5         On September 26, 2008, Dr. John Mackey completed a "Mental Impairment

6   Questionnaire" regarding Plaintiff's mental health.  (AR 711-714.)  Dr. Mackey reported that he

7   has visited with Plaintiff intermittently over the past two years and identified Plaintiff's symptoms

8   as the following: anhedonia[13] or pervasive loss of interest in almost all activities; decreased

9   energy; thoughts of suicide; feelings of guilt or worthlessness;  generalized persistent anxiety;

10  mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect;

11  apprehensive expectation; emotional withdrawal or isolation; psychological or behavioral

12  abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be

13  etiologically related to the abnormal mental state and loss of previously acquired functional

14  abilities; emotional lability; memory impairment - short, intermediate or long term; and sleep

15  disturbance.  (AR 711, 712.)  Dr. Mackey concluded that Plaintiff had marked limitations in

16  restriction of activity of daily living and difficulties in maintaining social functioning; moderate

17  limitations in deficiencies of concentration, persistence, or pace; and only one or two repeated

18  episodes of decompensation within a 12 month period, each of at least two weeks duration.  (AR

19  713.)  He determined that Plaintiff's impairments would cause her to be absent from work for

20  three or more days a month, with impairments expected to last at least 12 months and he assigned

21  Plaintiff a Global Assessment Functioning ("GAF") score of 45.[14]  (AR 713, 714.)

22

23  ───────────────
    [13] Anhedonia is "[t]he inability to gain pleasure from normally pleasurable experiences."
24  *Definition of Anhedonia*, MedicineNet,
    http://www.medicinenet.com/script/main/art.asp?articlekey=17900 (last visited Dec. 20, 2016).
25
    [14] The GAF Scale "represents the fifth stage of the multi-axial assessment process that clinicians
26  and physicians may use to determine an individual's level of psychosocial functioning." A score
    of 45 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
27  shoplifting) or any serious impairment in social or occupational functioning (e.g., no friends)."
    *Understanding the Global Assessment of Functioning Scale*, Seniorhomes.com,
28  https://www.seniorhomes.com/p/understanding-the-global-assessment-of-functioning-scale/ (last
    visited Dec. 20, 2016).

United States District Court
Northern District of California

4.      *Treating Physician Dr. Lee*

Dr. James Lee, Plaintiff's primary care physician from Kaiser Permanente, completed a "Fibromyalgia Residual Functional Capacity Questionnaire" on September 6, 2008.  (AR 705-709.)  The questionnaire is a check-box report and provides an opportunity for brief comments, which Dr. Lee provided throughout.  (*Id.*)  Dr. Lee found that Plaintiff met the American College of Rheumatology criteria for fibromyalgia and also suffered from sleep disorder, depression, and chronic pain.  (AR 705.)  He noted that clinical findings, including spinal imaging showing cervical lordosis and tender trigger points, supported his diagnosis.  (*Id.*)  Dr. Lee also noted that Plaintiff experienced a constant five to nine out of ten pain level, with headaches and work tension.  (AR 706.)  With respect to Plaintiff's mental residual functional capacity, Dr. Lee concluded that Plaintiff was incapable of tolerating even "low stress" jobs and that her medications could impair her ability to concentrate and increases her fatigue.  (*Id.*)

As to Plaintiff's physical limitations, Dr. Lee opined that Plaintiff could sit, stand, or walk for less than two hours in an entire eight-hour workday.  (AR 707.)  He also found that Plaintiff required a job that permits shifting positions at will from sitting, standing, and walking, as well as unscheduled breaks two to three times daily.  (*Id.*)  Dr. Lee further concluded that Plaintiff should never stoop, climb ladders, or lift and carry anything above ten pounds.  (AR 708.)

5.      *Examining Neuropsychologist Dr. Bastien*

In August 2008, Dr. Sheila Bastien met with Plaintiff to conduct a series of interviews and tests, then wrote a neuropsychological report regarding her current state.  (AR 718-739.)  During the interview, apart from the various neuropsychological testing that Plaintiff underwent, Plaintiff stated that she felt bothered in rooms where people smoked and beauty salons.  Plaintiff also felt sensitive to reading newspapers and using cleaning supplies like ammonia or chlorine bleach, which caused her eyes to swell and itch.  (AR 720.)  Plaintiff also told Dr. Bastien that she could not think straight and made mistakes when she was around certain chemicals or scents, but did not indicate which ones.  (AR 720-721.)

Dr. Bastien found that Plaintiff struggled with contextual verbal and figural memory, which would handicap her in the workplace.  (AR 735.)  Dr. Bastien determined that Plaintiff had

United States District Court
Northern District of California

"significant problems in working memory and visual perceptual problems[,]" with the most significant problem being her poor processing speed. (*Id.*) Dr. Bastien concluded that Plaintiff had such low aptitudes that "it is impossible to think of any job in the national economy in which she could function effectively." (*Id.*) Although Dr. Bastien did not conduct any chemical sensitivity tests, she concluded based on the interview that Plaintiff had developed a multiple chemical sensitivity over the past seven years. (*Id.*) Dr. Bastien also concluded that Plaintiff's depression was reactive to her chemical sensitivity. (AR 736.)

Based on her assessment, Dr. Bastien concluded that Plaintiff would have extreme restrictions in activities of daily living and episodes of deterioration or decompensation and marked difficulties in maintaining social functioning and concentration, persistence, or pace. (AR 738-739.) She opined that Plaintiff was "totally and completely disabled from any gainful employment at present, and this is based on multiple areas of disability." (AR 739 (emphasis omitted).)

## II.     Plaintiff's ALJ Hearing

On January 23, 2009, Plaintiff appeared at her hearing before ALJ Thomas P. Tielens in person. (AR 40.) Plaintiff testified and VE Linda Berkley testified over the phone. (*Id.*)

A.       <u>Plaintiff's Testimony</u>

Plaintiff suffered from fibromyalgia, mental confusion, and stress for years. (AR 50.) Plaintiff also testified about her work accident in April 2006, which ultimately caused her to leave work. (AR 46.) She explained that she pulled her back while transferring a patient and, as a result, went on medical leave until October of that year. (AR 49.) Following medical leave, Plaintiff returned to work for two weeks but felt like her concentration, pain, fatigue, and mental fogginess disrupted her ability to work. (AR 50.) For example, Plaintiff discussed a time she failed to hear her patient's ventilator alarms go off, and she felt horrified. (AR 46.) Plaintiff struggled to ensure that her patients received the correct dose of medication at the right time, despite her previously being able to do it so "natural[ly] and eas[il]y." (AR 63.) She also felt fatigued; after a shift, she would need to sleep for 14 hours. (AR 64.) Plaintiff ultimately quit due to her confusion and exhaustion and applied for disability. (AR 46.)

1    When the ALJ asked why Plaintiff did not see the SSA's consultative examiner, Dr.

2  Holloway, in August 2007, Plaintiff responded that she was embarrassed to divulge her private

3  information.  (AR 50-51; *see* AR 298-300.)  She also worried about her career, explaining that

4  "doctors have certain obligations . . .  I just didn't know what they were going to do, [like] contact

5  the board of nursing[.]"  (AR 51.)

6    Plaintiff also discussed her suicidal thoughts after leaving the nursing profession.  (AR 66-

7  67.)  Though Plaintiff would not actually commit suicide, she thought about it when her pain

8  negatively affected her thought and memory so much so that she could no longer access her

9  learned coping skills.  (AR 67.)

10    As to her chemical sensitivity, Plaintiff had allergies, asthma, and strep infections as a

11  child.  (AR 59.)  Though Plaintiff was aware of her symptoms, she did not even know about

12  chemical sensitivities as a diagnosis until she met with Dr. Bastien.  (AR 59.)  The ALJ expressed

13  doubt about the chemical sensitivities diagnosis and asked Plaintiff whether there was any testing

14  or other doctors that confirmed that chemical sensitivities were causing Plaintiff's problems

15  instead of fibromyalgia.  (AR 61.)  Plaintiff responded that it's "impossible to make the distinction

16  between the mental fogginess and concentration problems of fibromyalgia" with her cognitive

17  problems.  (AR 61.)  Plaintiff could not recall if she mentioned her chemical sensitivities diagnosis

18  from Dr. Bastien to her treating doctors at Kaiser Permanente.  (AR 67-68.)

19    B.    Vocational Expert's Testimony

20    The ALJ presented the VE with a hypothetical individual of Plaintiff's age, education, and

21  past work experience, who could do light work; should only occasionally climb, balance, stoop,

22  crouch, or crawl; should not use ladders, ropes, or scaffolds; would be capable of simple, one-,

23  two-, three-step work; would work best in a stable environment and receive non-direct criticism

24  rather than direct criticism; and would need to take advantage of the normal breaks every two

25  hours, lunch, and after work.  (AR 69-70.)  The VE concluded that such a person could not

26  perform Plaintiff's past work, but could perform the job of mail clerk, DOT code 209.687-026,

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   with a maximum specific vocational preparation ("SVP") of 2,[15] of which there are 2,000 jobs in

2   the Bay Area and 150,000 jobs nationally, as well as a small parts assembler II, DOT code

3   739.687-030, with an SVP of 2, of which there are 2,500 jobs in the Bay Area and 200,000 jobs

4   nationally.  (*Id.*)

5          The ALJ then offered a hypothetical of an individual with the same above limitations, but

6   who also would have to miss two or more days a month, more than the employer would normally

7   allow.  (*Id.*)  The expert testified that the individual could not maintain competitive employment.

8   (AR 70-71.)

9   **III.     The ALJ's Findings**

10         The ALJ performed the five-step disability analysis under 20 C.F.R. § 404.1520(a) and

11  found that Plaintiff was not disabled under Sections 216(i) and 223(d) of the Social Security Act.

12  (AR 39.)  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful

13  activity after her application date of April 28, 2006.  (AR 28.)  At the second step, the ALJ

14  determined that Plaintiff had the following severe impairments: fibromyalgia, depression, and

15  anxiety.  (*Id.*)  At the third step, the ALJ found that Plaintiff did not have an impairment or

16  combination of impairments that met or medically equaled one of the listed impairments in 20

17  C.F.R. Part 404, Subpart P, Appendix 1.  (AR 33.)  While the ALJ acknowledged that Plaintiff had

18  "severe" impairments, he concluded that her impairments were not attended with the specific

19  clinical signs and diagnostic findings required to meet or equal the requirements set forth in 20

20  C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.04, 12.06.  (AR 33.)

21         At the fourth step, the ALJ determined that Plaintiff had the Residual Functional Capacity

22  ("RFC") to climb, balance, stoop, crouch, crawl, and perform light work with normal breaks.  (AR

23  33.)  The ALJ concluded that Plaintiff should avoid climbing ladders, ropes, and scaffolds, and

24  would work best in a stable environment without direct criticism from her supervisors.  (*Id.*)

25  Regarding Plaintiff's own reports of her disabilities, the ALJ found her statements as to the

26

27  ───────────────────────
    [15] The DOT provides specific information about each job, including an SVP score, which
    "measures the amount of time it takes a worker to learn the skills necessary to perform a job."
28  *Adams v. Astrue*, No. C 10-2008 DMR, 2011 WL 1833015, at *2 (N.D. Cal. May 13, 2011)
    (citation omitted).  SVP scores range from 1 to 9, with a 9 taking the longest time to learn.  *Id.*

1   intensity, frequency, and limiting nature of her impairment were only partially credible.  (AR 37.)

2       Regarding Plaintiff's physical impairments, the ALJ gave little weight to Dr. Lee's

3   assessment given how few of Dr. Lee's reports are in the medical record.  (AR 34.)  The ALJ gave

4   significant weight to Dr. Desouza's physical limitations assessment and adopted his findings on

5   the grounds that it was consistent with the medical record.  (*Id.*)  Dr. Desouza found that Plaintiff

6   could carry 20 pounds and ten pounds frequently; stand, walk, and sit for six hours in an eight-

7   hour work day; had the ability to push and pull; and did not have manipulative, visual,

8   communicative, or environmental limitations.  (AR 244-247.)  Dr. Desouza also noted that

9   Plaintiff could occasionally climb ramps and stairs, balance, stoop, crouch, crawl, and should

10  avoid climbing ladders, ropes, and scaffolds.  (*Id.*)  The ALJ did not give Dr. Bastien's assessment

11  about Plaintiff's chemical sensitivity any weight because it was inconsistent with Plaintiff's

12  medical records with treating physicians and had insufficient facts to substantiate the conclusion.

13  (AR 35.)

14      As for Plaintiff's mental impairments, the ALJ gave great weight to Dr. Holloway's report

15  because it was supported by the psychiatric treatment Plaintiff received and corroborated by Dr.

16  Mackey's treatment notes.  (AR 34.)  The ALJ adopted Dr. Holloway's determinations that

17  Plaintiff could maintain attention and concentration for two hours, with breaks and rest periods,

18  and would work best in a stable environment without direct criticism from her supervisors.  (*Id.*)

19  The ALJ assigned limited weight to Dr. Mackey's assessment because it was inconsistent with his

20  own treatment notes with Plaintiff and the medical record.  (AR 31.)  The ALJ found that Dr.

21  Mackey did not provide justifications for reducing Plaintiff's previous GAF score from 61-70 in

22  April 2008 to 45 in September 2008.[16]  Furthermore, Dr. Mackey reported that Plaintiff's memory

23  and concentration did not improve with change in medications as of September 2008.  (*Id.*)

24  However, in a January 2008 report, Plaintiff noticed improvement in her memory after she

25

26  [16] A GAF score between 61-70 shows "[s]ome mild symptoms (e.g., depressed mood and mild
    insomnia) or some difficulty in social or occupational functioning (e.g., theft within the
27  household), but generally functioning pretty well, has some meaningful interpersonal
    relationships."  Understanding the Global Assessment of Functioning Scale, Seniorhomes.com,
    https://www.seniorhomes.com/p/understanding-the-global-assessment-of-functioning-scale/ (last
28  visited Dec. 20, 2016).

United States District Court
Northern District of California

1    discontinued use of Trazadone.  (*Id.*)

2        With respect to Plaintiff's own testimony, the ALJ found that Plaintiff's allegations were

3    partially credible.  (AR 36.)  The ALJ noted that Plaintiff's allegations were unsupported by her

4    medical records, reports of daily living, and her social activities over the entire period under

5    consideration.  (*Id.*)  The ALJ cited several examples.  For instance, Plaintiff testified that she was

6    unable to work since April 28, 2006, but the medical records established that Dr. Zweig released

7    Plaintiff to full work duty on October 3, 2006.  (*Id.*)  Additionally, Plaintiff stated that she was

8    unable to work due to her fibromyalgia, but she has had fibromyalgia for 25 to 30 years—*i.e.*, she

9    had it while she was working as a nurse.  (*Id.*)  The ALJ further noted that Plaintiff's complaints

10   regarding her mental fogginess and fatigue were found to be a result of her medications, not her

11   fibromyalgia.  (*Id.*)  The ALJ also highlighted Plaintiff's activities of daily living—specifically,

12   her testimony that she has been able to do household chores, visit friends, garden, cook, and take

13   short hikes.  (*Id.*)  While Mr. Morris, Plaintiff's husband, offered written statements that

14   corroborate Plaintiff's testimony regarding her level of pain and severity of symptoms, the ALJ

15   found his opinion only partially credible due to inconsistency with Plaintiff's own reported levels

16   of functioning as discussed above.  (AR 35-36.)

17       At the fifth step, the ALJ found that there were jobs that existed in significant numbers in

18   the national economy that Plaintiff could perform based on the VE's testimony and the RFC that

19   resulted.  (AR 38.)  The VE found that Plaintiff could perform unskilled, light occupations like a

20   mail clerk or small parts assembler.  (*Id.*)  Therefore, the ALJ found that Plaintiff was not

21   disabled.  (AR 39.)

22                                  **STANDARD OF REVIEW**

23       Pursuant to 42 U.S.C. § 405(g), the Court has authority to review an ALJ's decision to

24   deny benefits.  When exercising this authority, however, the "Social Security Administration's

25   disability determination should be upheld unless it contains legal error or is not supported by

26   substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Andrews v.*

27   *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

28   1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

United States District Court
Northern District of California

1    adequate to support a conclusion"; it is "more than a mere scintilla, but may be less than a

2    preponderance." *Molina*, 674 F.3d at 1110-11 (internal citations and quotation marks omitted);

3    *Andrews*, 53 F.3d at 1039 (same).  To determine whether the ALJ's decision is supported by

4    substantial evidence, the reviewing court "must consider the entire record as a whole and may not

5    affirm simply by isolating a specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d

6    1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted).

7         Determinations of credibility, resolution of conflicts in medical testimony, and all other

8    ambiguities are roles reserved for the ALJ.  *See Andrews*, 53 F.3d at 1039; *Magallanes*, 881 F.2d

9    at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the

10   record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and

11   quotation marks omitted); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1198 (9th Cir.

12   2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we

13   must defer to the ALJ's conclusion.").  "The court may not engage in second-guessing."

14   *Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding

15   contrary to that reached by the Commissioner; the Commissioner's determination as to a factual

16   matter will stand if supported by substantial evidence because it is the Commissioner's job, not the

17   Court's, to resolve conflicts in the evidence." *Bertrand v. Astrue*, No. 08-CV-00147-BAK, 2009

18   WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).  Similarly, "[a] decision of the ALJ will not be

19   reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

20   However, the Court can only affirm the ALJ's findings based on reasoning that the ALJ himself

21   asserted.  *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  In other words, the Court's

22   consideration is limited to "the grounds articulated by the agency[.]" *Cequerra v. Sec'y*, 933 F.2d

23   735, 738 (9th Cir. 1991).

                                    **DISCUSSION**

25        Plaintiff challenges two aspects of the ALJ's decision.  She contends that the ALJ: (1)

26   improperly considered Dr. Holloway's opinion and (2) erred in rejecting Plaintiff's pain and

27   symptoms testimony.  As discussed below, the Court concludes that the ALJ's consideration of

28   Dr. Holloway's opinion was not error, but the ALJ committed harmful error by failing to provide

United States District Court
Northern District of California

1    clear and convincing reasons supported by the record for rejecting Plaintiff's pain and symptoms

2    testimony.

3    **I.       The ALJ's Interpretation of Dr. Holloway's Opinion**

4           Dr. Holloway opined in relevant part that Plaintiff "is able to accept instruction and

5    criticism from her supervisors, but she would perform best if it is direct, non-intensive, and non-

6    confrontational."  (AR 283.)  The ALJ summarized this opinion as: "works best in a stable

7    environment without direct criticism from her supervisors."  (AR 34.)

8           Plaintiff argues that the ALJ rejected the portion of Dr. Holloway's opinion which states

9    that the criticism should be non-intensive and non-confrontational, and that the ALJ's language

10   "without direct criticism" mischaracterizes Dr. Holloway's opinion.  As a result, Plaintiff believes

11   that the ALJ's hypothetical question to the VE did not include Dr. Holloway's entire opinion, and

12   therefore the ALJ's decision based on the VE's testimony rests on legal error.  Not so.

13          First, Plaintiff's argument assumes that Dr. Holloway's language—"direct, non-intensive,

14   and non-confrontational"—so differs from the ALJ's language—"a stable environment without

15   direct criticism"—that it led to an erroneous RFC.  The plain meaning of the terms compels the

16   opposite conclusion.  Merriam-Webster Dictionary defines non-intensive as not "giving force or

17   emphasis to a statement" and non-confrontational as something other than a "face-to-face

18   meeting."  Merriam-Webster Dictionary (11th ed. 2016).  "Indirect criticism" implies the same

19   thing: expressing an evaluation without directly addressing the person.  Thus, the ALJ's

20   characterization of Dr. Holloway's opinion as concluding that Plaintiff should avoid direct

21   criticism satisfies Dr. Holloway's concerns about non-intensive and non-confrontational criticism.

22   Put another way, while the language differs, the ALJ's description appears to capture the essence

23   of Dr. Holloway's opinion.  Plaintiff has not cited any case that requires the ALJ to repeat a

24   physician's opinion verbatim, and the Court has found none.  Furthermore, the medical record

25   does not include any additional evidence about Plaintiff's ability to accept direct or indirect

26   criticism.

27          Relatedly, Plaintiff argues that the VE's testimony that Plaintiff could perform work only

28   with indirect criticism deviates from agency policy that defines "basic work activities" to include

*United States District Court*
*Northern District of California*

1   "[r]esponding appropriately to supervision, co-workers, and usual work situations."  20 C.F.R.

2   § 404.1521(b)(5).  Put simply, Plaintiff argues that the inability to receive direct criticism means

3   an individual cannot respond appropriately to supervisors and therefore cannot perform basic work

4   activities.  But the ability to receive indirect criticism does not necessarily mean that a person

5   cannot respond appropriately to supervision, and Plaintiff has not cited any cases that hold as

6   much.  What is more, Dr. Holloway specifically noted that Plaintiff is only moderately limited in

7   "the ability to accept instructions and respond appropriately to criticism from supervisors," and

8   not significantly limited in "the ability to get along with coworkers or peers without distracting

9   them or exhibiting behavioral extremes."  (AR 282.)  Thus, the ALJ gave the VE a complete

10  hypothetical and properly relied on the VE's testimony that a person with Plaintiff's RFC could

11  perform the mail clerk and small parts assembly jobs.

12  **II.**     **The ALJ's Rejection of Plaintiff's Pain and Symptoms Testimony**

13          A.      <u>Standard for Assessing Credibility</u>

14          The SSA policy on determining RFC directs ALJs to give "[c]areful consideration . . . to

15  any available information about symptoms because subjective descriptions may indicate more

16  severe limitations or restrictions that can be shown by medical evidence alone."  SSR 96-8P, 1996

17  WL 374184, at *5 (S.S.A. July 2, 1996).  If the record establishes the existence of an impairment

18  that could reasonably give rise to such symptoms, the "ALJ must make a finding as to the

19  credibility of the claimant's statements about the symptoms and their functional effect."  *Robbins*

20  *v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006); *see also Chaudhry v. Astrue*, 688 F.3d 661,

21  670 (9th Cir. 2012) ("Because the RFC determination must take into account the claimant's

22  testimony regarding [her] capability, the ALJ must assess that testimony in conjunction with the

23  medical evidence.").

24          To "determine whether a claimant's testimony regarding subjective pain or symptoms is

25  credible," an ALJ must use a "two-step analysis."  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th

26  Cir. 2014).  "First, the ALJ must determine whether the claimant has presented objective medical

27  evidence of an underlying impairment which could reasonably be expected to produce the pain or

28  other symptoms alleged."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1   citations and quotation marks omitted).  "Second, if the claimant meets the first test, and there is

2   no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her

3   symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal

4   citations and quotation marks omitted).

5          An ALJ is not "required to believe every allegation of disabling pain." *Fair v. Bowen*, 885

6   F.3d 597, 603 (9th Cir. 1989).  A claimant's credibility is most commonly called into question

7   whether her complaint is about "disabling pain that cannot be objectively ascertained." *Orn v.*

8   *Astrue*, 495 F.3d 625, 637 (9th Cir. 2007).  Because symptoms regarding pain are difficult to

9   quantify, the SSA regulations list relevant factors to assist ALJs in their credibility analysis.

10  These factors include:

> (1) the individual's daily activities; (2) the location, duration,
> frequency, and intensity of the individual's pain or other symptoms;
> (3) factors that precipitate and aggravate the symptoms; (4) the type,
> dosage, effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other symptoms; (5)
> treatment, other than medication, the individual receives or has
> received for relief of pain or other symptoms; (6) any measures
> other than treatment the individual uses or has used to relieve pain
> or other symptoms (e.g., lying flat on his or her back, standing for
> 15 to 20 minutes every hour, or sleeping on a board); and (7) any
> other factors concerning the individual's functional limitations and
> restrictions due to pain or other symptoms.

18  20 C.F.R. § 404.1529(c)(3);  *see also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)

19  ("In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,

20  inconsistencies either in his testimony or between his testimony and his conduct, his daily

21  activities, his work record, and testimony from physicians and third parties concerning the nature,

22  severity, and effect of the symptoms of which he complains.").  "To support a lack of credibility

23  finding" about a claimant's subjective pain complaints, an ALJ must "point to specific facts which

24  demonstrate that [the claimant] is in less pain than she claims." *Vasquez v. Astrue*, 572 F.3d 586,

25  591-92 (9th Cir. 2009) (internal citation and quotation omitted).  In sum, where the ALJ does not

26  find that a claimant was malingering, the ALJ is required to (1) specify which testimony the ALJ

27  finds not credible, and (2) provide specific, clear and convincing reasons supported by the record

28  for rejecting the claimant's subjective testimony. *See Lingenfelter*, 504 F.3d at 1036 (requiring

"clear and convincing" reasons).  The clear and convincing standard is "the most demanding required in Social Security cases."  *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002).  "General findings are an insufficient basis to support an adverse credibility determination."  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).  Rather, the ALJ "must state which pain testimony is not credible and what evidence suggests the claimant[ ][ is] not credible."  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.") (citation omitted).

      B.   <u>Analysis</u>

Applying the two-step analysis, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce her alleged symptoms," but that her statements concerning the "intensity, frequency and limiting nature of her impairment" were only partially credible.  (AR 37.)  In making this determination, the ALJ did not find that Plaintiff was malingering; he thus was required to set forth specific, clear and convincing reasons for rejecting Plaintiff's pain testimony.  *See Lingenfelter*, 504 F.3d at 1036.

The ALJ concluded that Plaintiff was only partially credible because her allegations were unsupported "by her medical records, reports of daily living, and her social activities over the entire period under consideration."  (AR 36.)

      1.   *Chemical Sensitivity*

The ALJ found Plaintiff's allegations of chemical sensitivity not credible because they conflicted with the medical record inasmuch as allergy tests reflected only mild allergies, and no tests or treating physicians ever confirmed the diagnosis.  (AR 37.)  This is a sufficiently specific, clear, and convincing reason to reject Plaintiff's reports of chemical sensitivity.

      2.   *Remaining Disabilities*

But the ALJ's explanation of finding Plaintiff's remaining disability allegations only "partially incredible" does not fare as well.  In *Brown-Hunter v. Colvin*, the Ninth Circuit held that ALJs must specifically identify which of the plaintiff's statements he finds incredible and why.

19

United States District Court
Northern District of California

806 F.3d at 494.  There, the ALJ erred because she "stated only that she found, based on unspecified claimant testimony and a summary of medical evidence, that the functional limitations from claimant's impairment were less serious than she has alleged." *Id.* at 493 (internal quotation marks omitted); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.").  Here, the ALJ did not identify particular testimony he found incredible.  Instead, he noted that Plaintiff's medical records "patently contradict her allegations of disability" generally then recited a summary of some medical records pertaining to Plaintiff's pain allegations and some pertaining to her activities of daily living.  (AR 36.)  While the ALJ summarized this information at some length, he failed to link those records to any particular testimony.  (AR 36-37.)  The ALJ's rejection of Plaintiff's testimony was thus in error.  *See Brown-Hunter*, 806 F.3d at 494.

For example, the ALJ stated that Plaintiff's "medical records patently contradict her allegations of disability" then referenced a medical notes indicating that before and after her car accident in 2007, Plaintiff was still able to exercise several days a week and perform household chores, and noted that her exercise helped to ameliorate her pain.  (AR 36.)  Although the ALJ appears to have focused on Plaintiff's physical condition in this section, he never clarified as much; instead, as in *Brown-Hunter*, he failed to identify what allegations of disability the records contradicted.

Moreover, in that discussion the ALJ identified medical evidence that undermined Plaintiff's reports of pain but ignored the evidence that supported her testimony.  *See Cotton v. Astrue*, 374 F. App'x 769, 773 (9th Cir. 2010) (holding that an ALJ's "cherry-picking of [claimant's] histrionic personality out of her host of other disorders is not a convincing basis for the adverse credibility finding"); *see also Williams v. Colvin*, No. ED CV 14-2146-PLA, 2015 WL 4507174, at *6 (C.D. Cal. July 23, 2015) ("An ALJ may not cherry-pick evidence to support the conclusion that a claimant is not disabled, but must consider the evidence as a whole in making a reasoned disability determination.").  For example, as late as 2008 a treating physician diagnosed Plaintiff with chronic pain syndrome, and despite continuing pain management programs, home exercises, and prescription medications to manage her pain (AR 492), a treating physician noted

20

that Plaintiff still experienced a constant five to nine out of ten pain level (AR 706).  The ALJ

erred by ignoring this evidence.

In addition, while the ALJ never explicitly says so, he seems to conclude that Plaintiff's

daily activities conflict with her claims of disability.  Although the SSA does not require claimants

to be "utterly incapacitated," a specific finding as to a claimant's ability to spend a substantial part

of his day engaged in activities involving the performance of physical activity transferable to a

work setting may be sufficient to discredit allegations of severe pain.  *Fair v. Bowen*, 885 F.2d

597, 603 (9th Cir. 1989).  Here, the ALJ noted that even after her car accident Plaintiff "still

washed the dishes, did limited meal preparation, some laundry, some limited yard work, and

limited housekeeping" and participated in a home exercise program.  (AR 36.)  But the ALJ failed

to acknowledge that Plaintiff engaged in these activities while reporting pain and needed to take

days off in between the activities.  Nor did the ALJ indicate precisely what alleged limitations

conflicted with these activities of daily living, which is inconsistent with the Ninth Circuit's

specificity requirements.  *See Lingenfelter*, 504 F.3d at 1036; *Garrison*, 759 F.3d at 1014; *see also*

*Burrell*, 775 F.3d at 1137 (finding the ALJ's rejection of the claimant's testimony insufficient

where "the ALJ did not elaborate on *which* daily activities conflicted with *which* part of

Claimant's testimony") (emphasis in original).   For example, in *Molina* the Ninth Circuit upheld

the ALJ's conclusion that the claimant was not credible because the claimant's "inability to

tolerate even minimal human interaction" was inconsistent with the activities of daily living.  647

F.3d at 1113.  Here, in contrast, the ALJ only generally stated that Plaintiff's records and activities

of daily living "patently contradict her allegations of disability."  (AR 36.)  This is not a clear and

convincing reason to reject Plaintiff's testimony.

Aside from a discussion about how Plaintiff's medical records and daily activities conflict

with her general "allegations of disability"—which, as explained above, is insufficient to meet the

ALJ's burden—the ALJ found incredible Plaintiff's statement "that she is unable to work due to

fibromyalgia[.]" (AR 36.)  Assuming that this is a specific enough identification of statements the

ALJ finds incredible, his rationale is inadequate.  The ALJ first noted that Plaintiff was able to

work as a nurse for many years with this diagnosis.  (*Id.*)  But this explanation ignores Plaintiff's

testimony and the medical records showing that her fibromyalgia symptoms worsened, eventually causing her to quit.  The ALJ also addressed Plaintiff's reports of mental fogginess, decreased cognition, and fatigue.  There, he did not state that he found incredible her testimony about the existence and extent of those issues.  (AR 36.)  Instead, he stated only that those symptoms were not a result of Plaintiff's fibromyalgia, but rather were side-effects of her many prescribed medications.  (*Id.*)  But Plaintiff took the medications to address her fibromyalgia symptoms, so the fibromyalgia was the ultimate source of her symptoms after all.  Thus, the reasons that the ALJ gave for rejecting Plaintiff's allegations about her mental fogginess, decreased cognition, and fatigue are not sufficient.

The ALJ adequately justified discounting Plaintiff's testimony about her chemical sensitivity, but erred in assessing Plaintiff's credibility given the Ninth Circuit's requirement that ALJs specifically identify which of a plaintiff's statements they find incredible and why and offer specific, clear, and convincing reasons for reaching that conclusion.  *See Brown-Hunter*, 806 F.3d at 494-95.  As the ALJ relied on Plaintiff's testimony to determine Plaintiff's RFC, the ALJ's error was not harmless.  *See Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (an ALJ's error is harmless when it is "irrelevant to the ALJ's ultimate disability conclusion").

**III.    Reversal or Remand**

In light of the ALJ's legal error in weighing the medical evidence, the Court must determine whether to remand this case to the SSA for further proceedings or with instructions to award benefits.  A district court may "revers[e] the decision of the Commissioner of Social Security, with or without remanded the case for a rehearing," *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original), but "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation," *id.* (citation omitted).  Ninth Circuit case law "precludes a district court from remanding a case for an award of benefits unless certain prerequisites are met."  *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) (citing *Burrell*, 775 F.3d at 1141).  "The district court must first determine that the ALJ made a legal error, such as failing to provide

United States District Court
Northern District of California

legally sufficient reasons for rejecting evidence." *Id.* (citation omitted). "If the court finds such an error, it must next review the record as a whole and determine whether it is fully developed, is free from conflicts and ambiguities, and all essential factual issues have been resolved." *Id.* (internal quotation marks and citation omitted). In doing so, "the district court must consider whether there are inconsistencies between [the claimant's] testimony and the medical evidence in the record, or whether the government has pointed to evidence in the record that the ALJ overlooked and explained how that evidence casts into serious doubt the claimant's claim to be disabled." *Id.* (internal quotation marks and citation omitted) (alteration in original). "Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits." *Id.* (citation omitted).

On the other hand, if the court determines that the record has, in fact, been fully developed and there are no outstanding issues left to be resolved, then it next must consider whether "the ALJ would be required to find the claimant disabled on remand if the improperly discredited evidence were credited as true." *Id.* (internal quotation marks and citation omitted). Put another way, the district court must consider the testimony or opinion that the ALJ improperly rejected, in the context of the otherwise undisputed record, and determine whether the ALJ would necessarily have to conclude that the claimant were disabled if that testimony or opinion were deemed true. If so, the district court may exercise its discretion to remand the case for an award of benefits. *Id.* (citation omitted). But courts are not required to exercise such discretion. *Id.* (citations omitted); *see also Connett*, 340 F.3d at 874-76; *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Instead, district courts "retain 'flexibility' in determining the appropriate remedy[.]" *Burrell*, 775 F.3d at 1141 (quoting *Garrison*, 759 F.3d at 1021). Specifically, the court "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" *Burrell*, 775 F.3d at 1141 (quoting *Garrison*, 759 F.3d at 1021); *see also Connett*, 340 F.3d at 874-76 (finding that a reviewing court retains discretion to remand for further proceedings even when the ALJ fails to "assert specific facts or reasons to reject [the claimant's] testimony").

Applying these principles here, the Court's conclusion that the ALJ erred in concluding

23

that Plaintiff was only partially credibly meets the threshold requirement of legal error in failing to provide legally sufficient reasons for rejecting evidence.  *See Dominguez*, 808 F.3d at 408.  The next question is whether the record has been fully developed and further administrative proceedings would serve no useful purpose.  *Id.* (citing *Burrell*, 775 F.3d at 1141).  Not so here. First, on remand the ALJ may be able to explain his reasons for finding Plaintiff only partially credible in legally sufficient detail.  And even if the Court were to credit as true Plaintiff's testimony about her symptoms, there are still conflicting medical opinions in the record. Accordingly, remand is necessary.

### CONCLUSION

For the reasons described above, the Court GRANTS IN PART Plaintiff's Motion for Summary Judgment (Dkt. No. 13) and DENIES Defendant's Cross-Motion for Summary Judgment (Dkt. No. 15).  The Court VACATES the ALJ's final decision and REMANDS for reconsideration consistent with this Order.

This Order disposes of Docket Nos. 13 and 15.

**IT IS SO ORDERED.**

Dated: December 20, 2016

JACQUELINE SCOTT CORLEY
United States Magistrate Judge